# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALICE V. GOODMAN, by her conservator FRANCINE GOODMAN, and FRANCINE GOODMAN, individually, | No. 3:16–cv–00665 (MPS) |
|     Plaintiffs, | |
|     v. | |
| RODERICK L. BREMBY, Commissioner of the Connecticut Department of Social Services ("DSS"), in his official capacity, et al., | September 20, 2017 |
|     Defendants. | |

## <u>RULING ON DEFENDANTS' MOTIONS TO DISMISS</u>

Plaintiffs Alice and Francine Goodman allege a civil RICO claim and a claim under 42 U.S.C. § 1985(3) against defendants Zullo, Allison, Spiegel, Puklin, Norwalk Hospital, and several Jane and John Does. The plaintiffs also allege state law claims against these defendants, as well as defendants Keogh and Murphy. Defendants Zullo, Allison, Spiegel, Puklin, and Norwalk Hospital separately have moved to dismiss both federal law claims and the various state law claims.

For the reasons that follow, I GRANT these defendants' motions to dismiss under Fed. R. Civ. P. 12(b)(6) on both federal law claims with prejudice, and I also DISMISS the federal law claims against the Jane and John Does. With no remaining federal law claims, I decline to exercise supplemental jurisdiction over all remaining state law claims and DISMISS them without prejudice.

### I.    Background

#### A.  <u>Factual Allegations</u>

Plaintiff Francine Goodman, on her own behalf, and as the conservator of Alice Goodman (Francine's elderly mother) brought this case against Roderick L. Bremby, the Commissioner of the Connecticut Department of Social Services ("DSS"), the Norwalk Hospital Association, Apex Clearing Corporation, Stephen Keogh (past conservator of Alice Goodman's estate), Frank N. Zullo (an attorney who represented Alice Goodman), Diane M. Allison (another attorney who represented Alice Goodman), Frank W. Murphy (a partner in Zullo's firm), Rhea Spiegel (the DSS worker assigned to Alice's case), Marcy Puklin (a clinical social worker assigned to Alice Goodman), and ten Jane and John Does (physicians, nurses, administrators, and/or other medical professionals at Norwalk Hospital).[1]

The second amended complaint alleges a scheme by the defendants to isolate Francine from Alice and to steal Alice's considerable wealth.[2] As background, the second amended complaint sets forth that Alice, her late husband, and Francine inherited and collected valuable antiques—in addition to amassing a substantial family fortune. (ECF No. 61 at ¶¶ 32–36.) When Alice's husband (Francine's father) died in 2008, he left half of his assets to a trust that named Francine as the trustee and remainderman. (*Id.* at ¶ 37.) He also left his personal antique and art collection to Francine. (*Id.* at ¶ 39.) Alice was named executor of his will (*id.* at ¶ 40), but that duty ultimately fell to Francine, under a durable power of attorney Alice gave her in 2006. (*Id.*)

Alice's health declined in 2013. Alice fell down a flight of stairs and broke her wrist, and the Norwalk Hospital treated her for that injury. (ECF No. 61 at ¶¶ 64–66.) Francine arrived in Connecticut after her mother had been released from the Hospital the day of the fall. (*Id.* at ¶ 66.)

---

[1] On October 11, 2016, plaintiff's counsel informed the Court that Alice Goodman had passed away on October 2, 2016. (ECF No. 57.) On January 3, 2017, Francine Goodman moved to substitute herself as the executrix of Alice Goodman's estate for Alice Goodman as a plaintiff. (ECF No. 74.) On January 26, 2017, the Court granted that motion. (ECF No. 85.)

[2] To avoid confusion, I will refer to Alice Goodman as "Alice" or "Mrs. Goodman" and Francine Goodman as "Francine."

The next morning, she noticed that Alice's memory seemed to be impaired. (*Id.* at ¶ 68.) Francine took her back to the hospital, and emergency room physicians there told Francine that Alice was suffering from dementia. (*Id.* at ¶ 72.)

Alice's dementia began to worsen. (ECF No. 61 at ¶¶ 74–80, 110–123.) Francine went to the Westport DSS office several times to seek help. (*Id.* at ¶ 81.) Eventually, DSS assigned Spiegel, a caseworker, to investigate an anonymous report that Alice was being financially exploited, and she visited the Goodmans' house. (*Id.* at ¶¶ 81–86.) The plaintiffs allege that this visit caused Alice to become upset and to "incorrectly believe that Francine had called DSS and instigated Spiegel's visit." (*Id.* at ¶¶ 89–92.) This caused misunderstandings, distrust, and strife between Alice, Francine, and Spiegel. (*Id.* at ¶¶ 93–109.)

About a month after Spiegel visited the Goodmans' house, defendant Zullo entered the picture. In March 2014, Alice and a friend went to visit Zullo, an attorney who previously had represented the Goodmans. (ECF No. 61 at ¶¶ 134–42.) Zullo agreed to represent Alice, allegedly "to help her find her [missing] checkbook." (*Id.* at ¶¶ 143–45.) After this visit, plaintiffs allege that Zullo "began moving aggressively to marginalize and isolate Francine[] and remove her from her mother's life." (*Id.* at ¶¶ 146–61.) Plaintiffs also allege that "in or about mid-March 2014, Zullo directed the United States Post Office to divert Mrs. Goodman's and Francine's mail[] and have it all sent to him." (*Id.* at ¶¶ 162–69.)

The plaintiffs next allege that Zullo brought defendant Diane Allison into a conspiracy to "take over Mrs. Goodman's millions of dollars in assets by exploiting her paranoid delusions and gaslighting her by manipulation of her mail, finances[,] and interpersonal relationships." (ECF No. 61 at ¶¶ 170–184.) Specifically, Zullo arranged for Alice to meet Allison, an attorney he "represented to be his partner." (*Id.* at ¶ 170.) Shortly thereafter, "Zullo and Allison spoke with .

. . Spiegel and directed Spiegel that all future communications should only be made to them." (*Id.* at ¶ 173.) The second amended complaint and the RICO case statement allege that Zullo, Allison, and Spiegel initially conspired and acted against Alice and Francine by (1) making arrangements to send Alice back to her native Belgium to stay with relatives there and to sell the Goodman house (*id.* at ¶ 182); (2) taking over Alice's financial accounts and healthcare decisions, while knowing that she was not competent, and also liquidating various accounts that Alice owned (*id.* at ¶¶ 234–44); and (3) separating Alice and Francine by, among other things, changing the locks on the house, thereby preventing Francine from entering and Alice from leaving. (*Id.* at ¶¶ 217–221, 250.)

Next, the plaintiffs allege that Norwalk Hospital joined the conspiracy. On April 28, 2014, a DSS psychologist assigned to Alice's case accompanied her to Norwalk Hospital. At the hospital, she was admitted and given a "battery of mental and physical tests. . . to determine the nature and extent of her mental deterioration and whether it had a physical cause." (ECF No. 61 at ¶¶ 246–48, 267–73.) The plaintiffs claim that defendants Zullo, Allison, Spiegel, and Norwalk Hospital "executives, administrators[,] and employees, including the John Does 1[–]10 and the Jane Does 1[–]10, agreed that Francine was not to have access [to] Mrs. Goodman or any say in her medical care." (*Id.* at ¶ 277.) The plaintiffs state that these defendants joined the existing conspiracy and "lied to the hospital's non-conspiring nurses, security guards[,] and other staff in furtherance of their plot to marginalize Francine so they could misappropriate [Alice's] financial assets and . . . valuable personal property." (*Id.* at ¶¶ 276–307.) The plaintiffs also allege that Norwalk Hospital "caused to be mailed Mrs. Goodman's complete medical file to Zullo/Allison." (ECF No. 71 at 6.)

After Alice's hospital stay, the plaintiffs allege, the defendants' conspiracy to take money from Alice and separate her from Francine continued. Alice was upset that Francine had been staying in the Goodmans' house while she was in the hospital, so Allison told Francine to leave—

allegedly searching Francine on her way out. (ECF No. 61 at ¶¶ 321–31.) The plaintiffs also claim that the defendants took money from Alice's brokerage accounts. (*Id.* at ¶¶ 332–45; ECF No. 71 at 6.) Further, they claim that Zullo and Allison had Alice execute a new will that partially disinherited Francine, two durable powers of attorney (although they knew Alice was suffering from dementia), and a conservatorship form (although they knew Francine had filed a conservatorship petition in probate court). (ECF No. 61 at ¶¶ 360–65.) The defendants allegedly "used the threat of arrest [against Francine] to further isolate [Alice] from Francine and to thwart Francine's oversight of Mrs. Goodman's assets so they could continue appropriating the valuable personal property in" the Goodmans' house. (*Id.* at ¶¶ 397–404, 416–422.) Previously, Zullo had "convinced Westport Police to tell Mrs. Goodman's neighbors that they should call 911 immediately if they ever saw Francine in the neighborhood—which, of course they then did. . . At Zullo's urging, the Westport Police took Francine to the police station and held her there for hours at a time, but no charges were ever filed against her." (*Id.* at ¶¶ 193–94.) Allison also allegedly directed the tenants of a shopping center owned by Alice to pay "all future rents to [Allison] because Mrs. Goodman 'was almost ninety years old, and she can't handle this.'" (*Id.* at ¶¶ 405–15; ECF No. 71 at 6.)

All the while, the plaintiffs allege, the defendants continued impeding the mother-daughter relationship and "diverting, reading[,] and retaining personal mail, checks, bills, account statements[,] and confidential medical records belonging to both [Alice] and Francine." (ECF No. 61 at ¶¶ 416–433; ECF No. 71 at 6.) The plaintiffs also allege that the defendants interfered with the probate court's determination that Alice needed a temporary conservator appointed. (ECF No. 61 at ¶¶ 434–81.) Finally, the plaintiffs allege that Puklin joined this conspiracy—aiding in stealing from Alice and separating her from Francine, as well as in preventing Alice from receiving proper

5

medical care. (*Id.* at ¶¶ 482–564.) Although a probate judge had originally appointed Puklin's boss, defendant Keogh, as conservator for Alice, in October 2015 "the Connecticut Superior Court overturned Judge Wexler's order appointing Keogh as Mrs. Goodman's conservator. The Superior Court appointed Francine as the conservator of her mother's person and estate." (*Id.* at ¶ 557.)

### B. RICO Case Statement

On April 28, 2016, the plaintiffs filed their complaint. (ECF No. 1.) On June 20, 2016, they filed an amended complaint. (ECF. No. 12.) They did not file a RICO case statement within twenty days of filing that complaint, although the District of Connecticut has a standing order in RICO cases that requires plaintiffs to "file a RICO Case Statement within twenty (20) days of filing the complaint."[3] In response to the amended complaint, all of the identified defendants filed motions to dismiss. (ECF Nos. 41, 42, 43, 50, 51, 52, 53, 54, 55.) The defendants noted the failure to file a RICO case statement in support of their motions to dismiss the first amended complaint. (*See, e.g.*, ECF No. 51–1, 52–1.) On September 21, 2016, the Court entered an order, stating that if the plaintiff chose to amend the complaint in response to the motions, the Court would not allow any further amendments. (ECF No. 56.) On October 21, 2016, the plaintiffs filed their second amended complaint (ECF No. 61). The Court denied the original motions to dismiss as moot. (ECF No. 94.)

All identified defendants then refiled their motions to dismiss. (ECF Nos. 62, 63, 64, 65, 66, 68, 69, 70, 97.) After many of the defendants had refiled their motions to dismiss (ECF Nos. 62, 63, 64, 65, 66, 68, 69, and 70), the plaintiffs filed a RICO case statement for the first time. (ECF No. 71.) Regardless of the intent of plaintiff's counsel, proceeding in this manner effectively deprived some defendants of the opportunity to address fully the statements in the RICO case statement. Nonetheless, because the Local Rule did not unequivocally prohibit the plaintiffs from

---

[3] *See* D. Conn. Standing Order in Civil Rico Cases,
http://www.ctd.uscourts.gov/sites/default/files/Revised%20Local%20Rules%2005-24-2017.pdf, at 104.

proceeding in this manner, I will consider the plaintiffs' RICO case statement and accept its content as true. *McLaughlin v. Anderson*, 962 F.2d 187, 189 (2d Cir. 1992) ("In analyzing the issues on this motion to dismiss, we must take as true the facts as alleged in the complaint and as supplemented by the RICO case statement ordered by the district court.").

In their RICO case statement, the plaintiffs allege that Zullo, Allison, Spiegel, Puklin, and the Norwalk Hospital Association all violated 18 U.S.C. §§ 1962(c) and (d) by "engaging in mail and wire fraud and conversion to enrich themselves through a conspiracy that would have continued indefinitely if undetected," repeating the allegations found in the second amended complaint. (ECF No. 71 at 1.) Specifically, the plaintiffs allege that these five defendants committed the following predicate acts in violation of these statutes: (1) conspiring to gain control of Alice's financial assets and personal and business correspondence; (2) conspiring to isolate Alice from Francine; (3) conspiring to use their relationships with Alice and their positions to commit wire, mail, and bank fraud; (4) conspiring to close or liquidate Alice's financial accounts while she was not competent and then doing so; (5) conspiring to steal personal property from Alice; (6) conspiring to prevent Francine from fulfilling her duties as Alice's health care proxy and then failing to honor health care directives Alice previously had made; (7) conspiring to divert and read mail addressed to anyone at Alice's house; and (8) conspiring to "make sure that no person or entity honored the durable power of attorney that Mrs. Goodman had given to Francine in 2006." (*Id.* at 1–3.)

C. Legal Claims

In response to the motions to dismiss, the plaintiffs voluntarily dismissed their claims against defendants Bremby and Apex Clearing Corp. (ECF Nos. 78, 79.) Also, the plaintiffs withdrew their claim of negligent infliction of emotional distress against defendant Keogh (ECF

No. 76) and their claim of unjust enrichment against defendant Murphy. (ECF No. 77.) The plaintiffs further withdrew: (1) Alice's unjust enrichment claim against defendant Zullo, (2) their abuse of process claims against defendants Zullo, Allison, Spiegel, and Puklin, (3) their intentional and negligent infliction of emotional distress claims against Zullo, Allison, Spiegel, and Puklin, (4) Francine's negligent infliction of emotional distress claim against Norwalk Hospital, and (5) their *respondeat superior* claim against Puklin. (ECF Nos. 83 at 2, 96 at 2.) Defendant Murphy's motion to dismiss the state law claim of unjust enrichment is DENIED as moot because the plaintiffs have voluntarily dismissed that claim. (ECF Nos. 64, 77.) And Defendant Keogh's motion to dismiss the state law claim of negligent infliction of emotional distress likewise is DENIED as moot. (ECF Nos. 67, 76.)

Even in its pared-down form, the second amended complaint still sets forth a bevy of claims.[4] These include two federal law claims: (1) that certain defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq, by conspiring to take property from Alice; and (2) that certain defendants conspired to deprive Alice of her civil rights based on her status as a wealthy, disabled, elderly woman in violation of 42 U.S.C. § 1985(3). (ECF No. 61 at ¶¶ 565–84.) All of the plaintiffs' other claims are state law causes of

---

[4] Specifically, the plaintiffs' second amended complaint now alleges: (1) violation of RICO, including 18 U.S.C. §§ 1343, 1341, and 1962(c) and (d) against defendants Zullo, Allison, Norwalk Hospital, Spiegel, Jane/John Does 1-10, and Puklin; (2) violation of 42 U.S.C. §1985 against defendants Zullo, Allison, Norwalk Hospital, Spiegel, the Jane/John Does, and Puklin; (3) breach of fiduciary duty against Keogh; (4) breach of fiduciary duty against Zullo and Allison; (5) breach of fiduciary duty against Murphy; (6) malpractice against Keogh; (7) *respondeat superior* against Keogh; (8) malpractice against Zullo, Allison, and Murphy; (9) conversion against Zullo, Allison, Spiegel, and Puklin; (10) negligence against Keogh; (11) unjust enrichment against Allison; (12) libel, defamation, and defamation per se against Zullo, Allison, Spiegel, Puklin, Norwalk Hospital, and the Jane/John Does; (13) conversion against Zullo, Allison, and Keogh; (14) intentional infliction of emotional distress against Keogh; (15) malpractice against the Norwalk Hospital and Jane/John Does for not identifying Alice's breast cancer earlier; (16) negligence against Norwalk Hospital and the Jane/John Does for not properly identifying Alice's dementia; (17) intentional infliction of emotional distress against the Norwalk Hospital and the Jane and John Does; and (18) negligent infliction of emotional distress against the Jane and John Does. (ECF No. 61 at 565–921.)

action based on the common facts surrounding the defendants' treatment of Alice and Francine. (*Id.* at ¶¶ 585–921.)

There are several pending motions to dismiss. Defendant Norwalk Hospital has moved to dismiss the state law claims against it under Rule 12(b)(1) and to dismiss the RICO claim, the § 1985(3) claim, and the state law claims for libel/defamation, malpractice, common law negligence, and intentional infliction of emotional distress under Fed. R. Civ. P. 12(b)(6). (ECF No. 63.) Allison and Zullo have moved to dismiss the RICO and the § 1985(3) claims under Fed. R. Civ. P. 12(b)(6). (ECF Nos. 65, 68.) Puklin has moved to dismiss the state law claims based on a failure to file a healthcare opinion letter under Fed. R. Civ. P. 12(b)(1) and to dismiss the RICO and § 1985(3) federal law claims, as well as the state law claims for conversion and libel/defamation, under Fed. R. Civ. P. 12(b)(6). (ECF No. 70.) Spiegel has moved to dismiss the RICO and the § 1985(3) claims, as well as the state law claims for conversion and libel/defamation, under Fed. R. Civ. P. 12(b)(6). (ECF No. 97.)

For the reasons that follow, I GRANT the motions to dismiss the federal law claims. All remaining claims are state law claims over which I decline to exercise supplemental jurisdiction and are DISMISSED without prejudice.

## II.    Standard

Under Fed. R. Civ. P. 12(b)(6), the Court must determine whether the plaintiffs have alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under *Twombly*, the Court accepts as true all of the complaint's factual allegations—but not conclusory allegations—

when evaluating a motion to dismiss. *Twombly*, 550 U.S. at 572. The Court must "draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). "When a complaint is based solely on wholly conclusory allegations and provides no factual support for such claims, it is appropriate to grant defendants['] motion to dismiss." *Scott v. Town of Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004). For a complaint to survive a motion to dismiss, "[a]fter the court strips away conclusory allegations, there must remain sufficient well-pleaded factual allegations to nudge plaintiff's claims across the line from conceivable to plausible." *In re Fosamax Products Liab. Litig.*, No. 09–cv–1412, 2010 WL 1654156, at *1 (S.D.N.Y. Apr. 9, 2010).

When a plaintiff alleges RICO claims, he or she "must plead predicate acts sounding in fraud or mistake according to the particularity requirement of Rule 9(b); for other elements of a RICO claim—such as non-fraud predicate acts or . . . the existence of an 'enterprise'—a plaintiff's complaint need satisfy only the 'short and plain statement' standard of Rule 8(a)." *D. Penguin Bros. Ltd. v. City Nat. Bank*, 587 F. App'x 663, 666 (2d. Cir. 2014) (summary order). "Nevertheless, to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must offer more than labels and conclusions in pleading the non-fraud elements of a RICO claim under Rule 8(a)." *Id.* (internal quotation marks and citations omitted).

The District of Connecticut has a standing order in civil RICO cases that requires plaintiffs alleging a claim under 18 U.S.C. §§1961–68 to "file a RICO Case Statement within twenty (20) days of filing the complaint. Consistent with counsel's obligations under Fed. R. Civ. P. 11 to 'make a reasonable inquiry' prior to the filing of the complaint," the case statement must "state in detail" certain information, including: a description of the pattern of racketeering activity; a detailed description of the alleged enterprise; whether the plaintiff contends that the pattern of

racketeering activity and the enterprise are separate or have merged; and the alleged relationship between the activities of the enterprise and the pattern of racketeering activity.[5] As noted, the Court treats as supplemental factual allegations the statements in the RICO case statement and accepts them as true. *McLaughlin*, 962 F.2d at 189.

### III. Discussion

#### A. Federal law claims

##### 1. Civil RICO (count 1)

The plaintiff's first claim is that defendants Zullo, Allison, Spiegel, Puklin, the Norwalk Hospital, and the Jane and John Does (1) violated 18 U.S.C. §1962(c) by conspiring to violate 18 U.S.C. §§ 1341 and 1343 and (2) violated § 1962(d) by "conspir[ing] to violate 18 U.S.C. §1962(c)." (ECF No. 61 at ¶¶ 565–78.)

###### a. § 1962(c)

Stating a claim under § 1962(c) requires that a plaintiff plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *D. Penguin Bros. Ltd.*, 587 F. App'x at 665 (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). "Mere common-law fraud does not constitute racketeering activity for RICO purposes." *Cofacredit, S.A. v. Windsor Plumbing Supply*, 187 F.3d 229, 242 (2d Cir. 1999).

###### i. No pattern of racketeering activity

To establish a "pattern of racketeering activity," a plaintiff must allege "at least two acts of racketeering activity within a 10-year period." *Cofacredit*, 187 F.3d at 242 (internal quotation marks omitted) (citing 18 U.S.C. § 1961(5)). In addition, the predicate acts of racketeering activity must be "related *and* amount to or pose a threat of continued criminal activity." *Id.* (emphasis in

---

[5] *See* D. Conn. Standing Order in Civil Rico Cases,
http://www.ctd.uscourts.gov/sites/default/files/Revised%20Local%20Rules%2005-24-2017.pdf, at 104.

original). To establish the continuity necessary to prove a pattern, "[a] plaintiff in a RICO action must allege either an open-ended pattern of racketeering activity (i.e., past criminal conduct with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)." *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 466 (2d Cir. 1995) (internal citation marks omitted). In analyzing the issue of continuity, "[a]ssuming arguendo that the alleged predicate acts constituting the pattern were adequately pled, we evaluate the RICO allegations with respect to each defendant individually." *First Capital Asset Mgmt., Inc. v. Satinwood Inc.*, 385 F.3d 159, 180 (2d Cir. 2004).

I find that plaintiffs have not alleged either type of continuity, against any of the defendants, in their second amended complaint.

### 1. Closed-ended continuity

The plaintiffs fail to allege a pattern of racketeering activity that had closed-ended continuity. "To satisfy close-ended continuity, the plaintiff must prove a series of related predicates extending over a substantial period of time." *Cofacredit*, 187 F.3d at 242. The Second Circuit "has never held a period of less than two years to constitute a substantial period of time." *Id.*; *GICC Capital Corp.*, 67 F.3d at 467 (collecting cases). "[T]he duration of a pattern of racketeering activity is measured by the RICO predicate acts the defendants commit." *Cofacredit*, 187 F.3d at 243. "Although close-ended continuity is primarily a temporal concept, other factors such as number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." *Id.* at 242.

From the first alleged predicate act to the last, for any defendant, the plaintiffs' allegations do not span a two-year period. The first predicate act that the plaintiffs allege is that, in March

2014, Zullo "directed the United States Post Office to divert Mrs. Goodman's and Francine's mail[] and have it all sent to him." (ECF No. 61 at ¶¶ 162–69.) "The Superior Court appointed Francine as the conservator of her mother's person and estate" in October 2015. (*Id.* at ¶ 557.) Once Francine became the conservator for Alice, the defendants had no further opportunity to exploit and control her, and the plaintiffs do not allege that any predicate acts occurred after October 2015. (*Id.*) ("The Defendants' wholesale looting of the Goodman Family Home continued unimpeded until October 2015, [when the Superior Court appointed Francine conservator.]"); (*see also id.* ¶ 576) ("The unlawful conduct . . . was continuous and open ended[] and was intended to continue and . . . did continue until an October 15, 2015 order by the Connecticut Superior Court allowed Francine to resume her oversight of her mother's 'person and estate.'") The plaintiffs state in the RICO case statement that "if undetected," the association-in-fact enterprise "would have continued indefinitely." (ECF No. 71 at 8.) But the facts alleged do not support this conclusion because there was no danger the defendants could continue their "looting . . . unimpeded" once Francine was appointed conservator and thus placed in charge of Alice's estate and person. In fact, the plaintiffs themselves also state in their RICO case statement that "[t]hroughout 2014 and *continuing until October 15, 2015*, the Conspiring Defendants constituted an association-in-fact enterprise[.]" (*Id.*) (emphasis added.) This statement confirms the allegations in the complaint (ECF No. 61 at ¶¶ 557, 576) that the defendants' alleged threat to Alice ended once Francine was appointed conservator. Therefore, the plaintiffs allege predicate acts spanning, at most (i.e., in the case of Zullo) 19 months, which is insufficient in the Second Circuit to establish closed-end continuity. *GICC Capital Corp.*, 67 F.3d at 467.

### 2. Open-ended continuity

The plaintiffs also do not allege a conspiracy with open-ended continuity. "To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit*, 187 F.3d at 242. Courts should analyze whether the alleged unlawful acts were "a regular means by which [defendants] conducted their . . . business" or whether the alleged activity was "a discrete and relatively short-lived scheme to defraud a handful of victims through racketeering activity." *Id.* at 244.

The plaintiffs have failed to allege open-ended continuity because their only non-conclusory allegations describe a scheme to steal from a single victim, Alice Goodman. The plaintiffs have not alleged facts suggesting that there was any threat of the defendants' continuing this conduct against other victims. Although the plaintiffs do claim that the defendants were motivated by animus against wealthy, disabled, elderly people (ECF No. 61 at ¶ 582), they plead no facts to support this claim in the second amended complaint or in their RICO case statement. The only predicate acts they allege with any specificity are those targeted at Alice. (*See* ECF No. 71 at 1–8.) Therefore, once the appointment of Francine terminated their ability to harm Alice, the alleged conspiracy ended. There was thus "no threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit*, 187 F.3d at 242.

As such, the plaintiffs have failed to allege adequately that the defendants participated in an open-ended pattern of racketeering activity.

### ii. No enterprise

In addition, the plaintiffs have failed to allege that the defendants formed an enterprise. An enterprise includes "any individual, partnership, corporation, association, or other legal entity, and

any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Any legal entity may qualify as a RICO enterprise, *First Capital*, 385 F.3d at 173, or a plaintiff can prove an association-in-fact enterprise "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle v. United States*, 556 U.S. 938, 945 (2009) (internal quotation marks omitted). The plaintiffs allege solely an association-in-fact enterprise. Nowhere in their pleadings do they assert any other form of an enterprise. [6]

An association-in-fact enterprise "must have at least three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *U.S. v. Turkette*, 452 U.S. 576, 582 (1981). "For an association of individuals to constitute an enterprise, we have required that the members of the association share a common purpose to engage in a particular fraudulent course of conduct

---

[6] In their complaint, the plaintiffs state:

> The association-in-fact enterprise of the Initial Conspirators, Puklin, Norwalk Hospital[,]. . . the John Does 1[–]10[,] and the Jane Does 1[–]10 is an "enterprise" as that term is defined in 18 U.S.C. 1961(4). Since at least 2014, the association-in-fact enterprise had the purpose of assuming control over the persons and estates of elderly Connecticut residents suffering from dementia like Mrs. Goodman by isolating the elderly from their immediate family for the purpose of taking control over their persons and their estates and stealing their financial assets and valuable personal property. The foregoing enterprise has been engaged in activities that affect interstate commerce in that the banking, financial[,] and securities accounts that [Zullo, Allison, Spiegel, Puklin, and Norwalk Hospital] have seized and looted are located through the State of Connecticut and other states across the country.

(ECF No. 61 at ¶ 566–68.) In their RICO case statement, the plaintiffs describe the enterprise as:

> [t]hroughout 2014 and continuing until October 15, 2015, the Conspiring Defendants constituted an association-in-fact enterprise that conducted its affairs through a pattern of racketeering activity that, undetected, would have continued indefinitely. Each of the Conspiring Defendants was a member of the enterprise and participated in the operation and/or management of the enterprise, the purpose of which was to deprive Mrs. Goodman and Francine of (i) money; (ii) valuable personal property; (iii) real property; (iv) their rights of privacy, family integrity and association; and (v) Mrs. Goodman's civil rights. Each of the Conspiring Defendants participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

(ECF No. 71 at 8.) Further, the plaintiffs specifically clarify that they are *not* alleging that any existing organization constitutes the RICO-required enterprise. (ECF No. 96 at 9.)

and work together to achieve such purposes." *D. Penguin Bros. Ltd.*, 587 F. App'x at 667–68 (internal quotations and citations omitted). Simply alleging that the defendant committed one or more predicate crimes does not suffice to state a claim under RICO. *Id.* at 668–69 (internal citations omitted). And, even if a complaint "adequately plead[s] that [defendants] worked together in some respects[,]" that does not necessarily mean it creates a "plausible inference that [the defendants] did so . . . [for] their purported 'enterprise' or for any shared purpose." *Id.*

Alice's and Francine's allegations of an association-in-fact enterprise fall short of what Rule 8(a) requires because they do not sufficiently allege that the defendants were functioning as a continuing unit. The plaintiffs state that Zullo began the conspiracy by agreeing to represent Alice. (ECF No. 61 at ¶¶ 143–45.) In a conclusory way, the plaintiffs describe Zullo, Allison, and Spiegel as the "Initial Conspirators": "shortly after meeting with Mrs. Goodman," they allege, "Zullo and Allison spoke with Mrs. Goodman's DSS Social worker, Spiegel, and directed Spiegel that all future communications regarding Mrs. Goodman should only be made to them." (*Id.* at ¶ 173.) Then, "Spiegel joined Zullo's conspiracy to isolate Mrs. Goodman, exploit her paranoia to undermine her relationship with Francine, and take over Mrs. Goodman's considerable assets, and steal the valuable personal property at the Goodman Family Home." (*Id.* at ¶ 177.) They also allege that Norwalk Hospital was part of the enterprise because "Allison was the Chairperson of Norwalk Hospital's Board of Trustees, and Zullo was a Trustee" (*id.* at ¶ 276) and "Norwalk Hospital's executives, administrators, and employees, including the John Does 1[–]10 and the Jane Does 1[–]10 agreed that Francine was not to have access [to] Mrs. Goodman or any say in her medical care." (*Id.* at ¶ 277.) Finally, they allege that "Puklin soon joined the Initial Conspirators in looting the assets of both Mrs. Goodman and Francine." (*Id.* at ¶ 522.)

Although the second amended complaint describes in detail numerous acts that allegedly were committed in furtherance of this conspiracy, it provides no "information regarding the hierarchy, organization, and activities of this alleged association-in-fact enterprise." *First Capital Asset Management, Inc.*, 385 F.3d at 174 (internal citations and quotation marks omitted). Indeed, in their RICO case statement, the plaintiffs acknowledge that "they lack sufficient information at this juncture to discuss the 'usual and daily activities' of the enterprise." (ECF No. 71 at 9.) Further, although plaintiffs contend in their brief that the "hierarchy and organization of the enterprise are obvious" and that "Zullo was the principal architect of the enterprise, with Allison acting as his lieutenant," they point to no allegations that support this contention. The allegations in the Second Amended Complaint concerning Zullo's "bring[ing] in" Allison to the conspiracy do not suggest that he directed Allison as his "lieutenant." (ECF No. 61 ¶¶ 170–73.) Nor do the allegations concerning Puklin suggest, as the plaintiffs contend, that she acted under the direction of Allison or Zullo. (*Id.* at ¶¶ 522–29.)

The plaintiffs also do not provide factual allegations regarding how the enterprise functioned. For example, neither the phone call they describe nor the defendants' communications about Alice suggest that the supposed enterprise was a continuing unit. In addition, stating that Spiegel had some, limited contact with Allison and Zullo does not establish that they were directing Spiegel in any way. (ECF No. 61 at ¶ 173.) And stating that Zullo and Allison were members of the Norwalk Hospital's board is insufficient to create an inference that they directed Norwalk Hospital employees to give faulty information or inadequate medical care to Alice or that those employees were subject to their direction as part of an enterprise. (*Id.* at ¶ 276.) In short, the plaintiffs have failed to allege that an enterprise existed.

iii. No separateness between racketeering activity and the enterprise

The plaintiffs' failure to allege the existence of an enterprise means that they also do not adequately allege separateness between the racketeering activity and the alleged enterprise. To allege a RICO claim, "the enterprise must also exist *separate and apart from the pattern of activity* in which it engages." *D. Penguin Bros.*, 587 F. App'x at 667 (emphasis added) (citing *Turkette*, 452 U.S. at 583) (internal quotation marks omitted). That is, "RICO is not violated every time two or more individuals commit one of the predicate crimes listed in the statute." *Id.* at 668 (citing *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 851 (7th Cir. 2013)) (internal quotation marks omitted).

All of the plaintiffs' allegations in the RICO case statement and in the second amended complaint that describe the functioning of the conspiracy specify how the defendants went about accomplishing predicate acts aimed at stealing the assets of a single victim—Alice Goodman. The predicate acts are the machinations undertaken by the defendants to steal Alice's assets, and the "enterprise" is simply the group of defendants who engaged in those machinations. There is no independent "enterprise," i.e., there are no allegations that defendants functioned as an enterprise, apart from coordinating the alleged predicate acts, and there is no specification of a shared purpose held by the defendants that would outlive their scheme to loot the Goodman estate. (*See* ECF Nos. 71 at 8, 61 at ¶ 577) ("Mrs. Goodman and Francine were the intended targets of the scheme that was facilitated by the knowing and purposeful involvement of the . . . Initial Conspirators, Puklin, Norwalk Hospital[,]" and the Jane and John Does.) The RICO case statement simply states, in conclusory fashion, that "[e]ach of the Conspiring Defendants was a member of the enterprise and participated in the operation and/or management of the enterprise, the purpose of which was to deprive Mrs. Goodman and Francine of (i) money; (ii) valuable personal property; (iii) real

property; (iv) their rights of privacy, family integrity and association; and (v) Mrs. Goodman's civil rights." (*Id.*) The plaintiffs thus fail to plead facts suggesting that the supposed enterprise "is an entity separate and apart from the pattern of activity in which it engages." *United States v. Turkette*, 452 U.S. at 583.

> iv. Predicate acts of Norwalk Hospital, Puklin, and Spiegel are not
> pled in accordance with Rule 9(b)

Finally, the plaintiffs do not plead predicate acts by Norwalk Hospital, Puklin, or Spiegel with the specificity required by Fed. R. Civ. P. 9(b). As noted, when a plaintiff alleges RICO claims, he or she "must plead predicate acts sounding in fraud or mistake according to the particularity requirement of Rule 9(b)[.]" *D. Penguin Bros. Ltd.*, 587 F. App'x at 666. Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A plaintiff fails to meet the Rule 9(b) particularity requirements where he or she fails "to specify the time, place, speaker, and . . . even the content of the alleged" fraudulent communications. *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).

## 1. Norwalk Hospital

The only predicate act of racketeering attributed to Norwalk Hospital in the RICO case statement is the mailing of Alice's medical records to Zullo and Allison on May 14, 2014. (ECF No. 71 at 6.) This is not suggestive of mail or wire fraud, the only types of predicate acts specified in the RICO case statement. (*Id.*) The complaint also alleges that Norwalk Hospital "refused to honor" Francine's 2006 power of attorney and her 2006 Health Care Proxy and that Hospital staff "refused to . . . discuss any aspect of Mrs. Goodman's condition or treatment with Francine." (ECF No. 61 at ¶¶ 279–92.) This is also not suggestive of any type of fraud.

Further, the plaintiffs do not plead anything the Hospital did on its own; instead, they recite a series of acts committed by a group consisting of "Norwalk Hospital's executives, administrators, and employees, the John Does 1[–]10 and the Jane Does 1[–]10, and the Initial Conspirators." (ECF No. 61 at ¶¶ 279–92.) This failure to specify the Hospital's participation in the alleged fraudulent acts falls short of the specificity required by Rule 9. *Divittorio v. Equidyne Extractive Indus. Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."). In addition, to the extent any of these alleged acts are suggestive of fraud, they are not pled with particularity. (*See id.* at ¶¶ 280, 282–83) ("Norwalk Hospital's executives, administrators and employees, the John Does 1[–]10 and the Jane Does 1[–]10 conspired with the Initial Conspirators to refuse to honor Francine's authority and rights with respect to her mother's treatment and care, falsely telling non-conspiring Norwalk Hospital personnel that Francine's 2006 Health Care Proxy and 2006 Durable Power of Attorney had been revoked.") ("The Initial Conspirators, Norwalk Hospital's executives, administrators and employees, the John Does 1[–]10 and the Jane Does 1[–]10 lied to the hospital's non-conspiring nurses, security guards[,] and other staff in furtherance of their plot to marginalize Francine so they could misappropriate Mrs. Goodman's financial assets and the valuable personal property in the Goodman Family Home without Francine's knowledge or interference.") ("The Initial Conspirators, Norwalk Hospital's executives, administrators and employees, the John Does 1[–]10 and the Jane Does 1[–]10 lied to the hospital's non-conspiring nurses, security guards[,] and other staff telling them that a restraining order had been taken out to protect Mrs. Goodman from Francine, and therefore, Francine was not to have any access to her mother under any circumstances.") There is no specification of who told these lies, when they were told, or to whom

they were told. *Luce*, 802 F.2d at 54. These generalized allegations do not meet the standard set forth in Rule 9(b) and therefore do not survive defendants' motions to dismiss.

## 2. Puklin

With regard to Puklin, neither the RICO case statement nor the second amended complaint identifies any predicate acts of mail or wire fraud that she committed. According to the complaint, Puklin did not enter the picture until June 13, 2014—at the third conservatorship hearing. (*See* ECF No. 61 at ¶ 462.) After that hearing, the only actions the second amended complaint attributes specifically to Puklin are that, while serving as Alice's geriatric care manager, she: (1) notified Keogh about doctors' instructions given to Alice (*id.* at ¶ 496); (2) "joined the Initial Conspirators in looting the assets of both Mrs. Goodman and Francine" (*id.* at ¶ 522); (3) conducted an "inventory of the personal property" in Alice's house and carried out boxes that she then drove off with (*id* at ¶¶ 523–24); (4) "exacerbated the rift that [Zullo, Allison, and Spiegel] were fostering between Francine and Mrs. Goodman" by "accompany[ying] Mrs. Goodman to her doctors' appointments and medical evaluations" and making sure that "derogatory misstatements of fact about Francine were included in every medical write-up on Mrs. Goodman"; and (5) arranged for a locksmith to open the locks on a safe in the Goodman house, after Keogh, her boss, was appointed Francine's conservator. (*Id.* at ¶¶ 531–32, 551.) The RICO case statement merely repeats these contentions. (ECF No. 71 at 2, 4.) To the extent these allegations suggest fraud at all, they do not comply with the particularity requirement of Rule 9(b): The only references to communications identified—the "derogatory misstatements of fact about Francine"—are devoid of details as to time and content. *Luce*, 802 F.2d at 54. Nor are there any details about what Puklin did to "join[] the Initial Conspirators in looting the assets of both Mrs. Goodman and Francine." (ECF No. 61 at ¶ 522.)

### 3. Spiegel

The plaintiffs' factual allegations about Spiegel similarly are insufficient under Rule 9. The plaintiffs' only assertion in their RICO case statement about how Spiegel engaged in wire fraud is that she participated in "the first of many telephone conversations [with Zullo and Allison] from the Goodman Family Home during which they acknowledged among themselves that Mrs. Goodman was not mentally competent." (ECF No. 71 at 7.) The plaintiffs state that "[d]uring this conversation Spiegel and Zullo and/or Allison conspired and agreed to share information and coordinate their activities and to marginalize Francine in furtherance of their plan to assume control over Mrs. Goodman's person and considerable estate." (*Id.*) This does not allege fraud with particularity, and neither do the allegations against Spiegel found in the second amended complaint. (*See* ECF No. 61 at ¶¶ 173–75, 178–83, 450) (stating that Spiegel participated in conversations regarding an alleged "plan" about Alice and that she coached Alice at the conservatorship hearing). There is no specification of "the time, place, speaker, and conduct" of any fraudulent statements by Spiegel. *Luce*, 802 F.2d at 54.

Therefore, for each of the above reasons, the plaintiffs have failed to state a claim under § 1962(c).

### b. § 1962(d)

The plaintiffs have not pled adequately a violation of 18 U.S.C. § 1962(d) either. "To establish the existence of a RICO conspiracy, a plaintiff must prove the existence of an agreement to violate RICO's substantive provisions." *Cofacredit*, 187 F.3d at 244 (internal citations omitted). "Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *Falise v. Am. Tobacco Co.*, 94 F. Supp.2d 316, 353 (E.D.N.Y. 2000) (internal citations omitted). The plaintiffs'

substantive RICO claim under § 1962(c) fails for the reasons set forth above, and so their § 1962(d) claim also fails.

As such, I GRANT defendants Zullo's, Allison's, Spiegel's, Puklin's, and Norwalk Hospital's motions to dismiss, and the plaintiff's RICO claim is also dismissed as to the Jane/John Doe defendants.

### 2. 42 U.S.C. § 1985 (Claim 2)

The plaintiff's remaining federal claim is that the "Initial Conspirators, Puklin, Norwalk Hospital, and [Jane and John Does] . . . conspired to and did deprive Mrs. Goodman and Francine of their civil rights, property rights, and rights of family integrity, movement, and association in violation of 42 U.S.C. § 1985(3)." (ECF No. 61 at ¶ 584.) This claim, too, fails as a matter of law for the reasons set forth below.

### a. Legal Principles

Subsection 1985(3) prohibits conspiracies "for the purpose of depriving . . . any person or class of persons of the equal protection of the laws." 42 U.S.C. § 1985(3). A plaintiff advancing a claim under § 1985(3) must allege:

> (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States.

*Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999).

"§ 1985(3) does not provide substantive rights itself; it provides a remedy for persons injured by a conspiracy to deprive them of the equal protection of the laws, or of equal privileges and immunities under the laws." *Jenkins v. Miller*, 983 F. Supp. 2d 423, 461 (D. Vt. 2013) (internal quotation marks omitted) (citing *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979) and *United Broth. of Carpenters and Joiners of America, Local 610, AFL-CIO v. Scott*, 463

U.S. 825, 832–33 (1982)). "The right or rights claimed to have been infringed must be found elsewhere." *Jenkins*, 983 F. Supp. at 461 (internal quotation marks and citations omitted) (citing *Novotny*, 442 U.S. at 372, *Carpenters*, 463 U.S. at 833).

In addition, a § 1985(3) "conspiracy must . . . be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Britt v. Garcia*, 457 F.3d 264, 270 n.4 (2d Cir. 2006) (internal quotation marks and citation omitted). The Supreme Court has been reluctant to turn § 1985 into "a general federal tort law." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

### b. No factual allegations of discrimination

First, the second amended complaint does not contain any non-conclusory allegations of discrimination. Alice and Francine allege that the Zullo, Allison, Spiegel, Puklin, Norwalk Hospital, and the John and Jane Does were motivated by "a discriminatory animus against wealthy, disabled senior citizens, like Mrs. Goodman, and against their family members who, like Francine, seek to protect and care for them." (ECF No. 61 at ¶ 582.) That is the single mention of discriminatory animus in the second amended complaint, and it is conclusory. There are no facts pled to suggest the defendant acted out of discriminatory animus against wealthy, disabled senior citizens. To the contrary, the complaint repeatedly alleges that the defendants were motivated by the prospect of financial gain. (*See, e.g.*, ECF No. 61 at ¶¶156, 161, 172, 179) ("Zullo had only one question for Francine during that visit: 'How much is her estate worth?'") ("[O]nce Zullo determined that Mrs. Goodman had a multi-million dollar estate, he began moving aggressively to marginalize and isolate Francine[] and remove her from her mother's life.") ("More important than what Zullo and Allison would do for Mrs. Goodman, however, was what Mrs. Goodman would do for them.") ("Instead, Spiegel joined Zullo's conspiracy to isolate Mrs. Goodman, exploit her

paranoia to undermine her relationship with Francine, and to take over Mrs. Goodman's considerable assets, and steal the valuable personal property at the Goodman Family Home.") Nor are there any facts pled to suggest that the defendants targeted other elderly, disabled, or wealthy people or treated Alice and Francine differently than anyone else. As such, the plaintiffs' claim of discriminatory animus is conclusory and fails under *Twombly*, 550 U.S. at 572.

      c.  No factual allegations of a purpose to deprive equal protection or equal privileges

The plaintiffs also have not alleged that that the defendants had a purpose to deprive Alice or Francine of the equal protection or privileges of the law. As noted, the plaintiffs' factual allegations make clear that the defendants' purpose was their own financial gain, not the deprivation of equal protection of the law. They plead no facts to suggest that the defendants acted with such a purpose.

      d.  Class of one

Next, to the extent the plaintiffs have alleged a class of one theory (*see* ECF No. 61 at ¶ 582), a Section 1985 claim may not be based on such a theory. *Doe v. Mastoloni*, No. 3:14–CV–00718 (CHS), 2016 WL 593439, at *16 (D. Conn. Feb. 12, 2016); *see also Carpenters*, 463 U.S. at 850 (Blackmun, J. dissenting) (stating that "the class must exist independently of the defendant's actions; that is, it cannot be defined simply as the group of victims of the tortious action"). In *Doe*, the court surveyed Second Circuit caselaw on this issue and found that

> district courts in this Circuit have expressly held that a § 1985 claim may not be premised on a class of one theory. *Volunteer Fire Ass'n of Tappan, Inc. v. Cty. of Rockland*, No. 09 cv 4622 CS, 2010 WL 4968247, at *8 n. 13 (S.D.N.Y. Nov. 24, 2010) ("A plaintiff alleging a Section 1985 violation may not proceed under a 'class of one' theory."); *Orr v. Wisner*, No. 3:08 CV 953 (JCH), 2010 WL 2667918, at *9 n. 9 (D. Conn. June 29, 2010) (stating that "[t]he emerging consensus among federal authority ... falls against the 'class of one' theory in the § 1985(3) context") (internal quotation marks omitted); *Chance v. Reed*, 583 F. Supp. 2d 500, 509 (D. Conn. 2008) ("The 'class of one' theory is insufficient to form the basis of a § 1985 action.").

2016 WL 593439, at *16.

The plaintiffs fail to respond to defendants' arguments on this point, which is, by itself, ground for dismissing any class of one claim. "When a plaintiff's specific claim is attacked in a motion to dismiss, a plaintiff must rebut the defendant's argument against that claim or it shall be deemed abandoned." *Massaro v. Allingtown Fire District*, No. 3:03-cv-00136 (EBB), 2006 WL 1668008, at *5 (D. Conn June 16, 2006). The defendants raised the class of one argument in various motions to dismiss, yet the plaintiffs did not respond to the argument in their opposition brief. (*See* ECF Nos. 68–1 at 16, 80, 97–1 at 15.) Accordingly, they have abandoned any such claim.

Therefore, I GRANT the defendants' motions to dismiss the plaintiffs' § 1985(3) claim.

### B. State law claims

There are no federal law claims remaining, and there is no diversity jurisdiction based on the citizenship of the parties, because Alice and several defendants are citizens of Connecticut.[7] Plaintiffs' other claims arise under state law. As such, I decline to exercise supplemental jurisdiction over them. *See* 28 U.S.C. § 1367(c)(3); *Astra Media Grp., LLC v. Clear Channel Taxi Media, LLC*, 414 Fed. App'x 334, 337 (2d Cir. 2011) ("[W]e have generally held that where all the federal claims have been dismissed at a relatively early stage, the district court should decline to exercise supplemental jurisdiction over pendent state-law claims.").

### IV. Conclusion

Therefore, I GRANT the defendants Zullo's, Allison's, Norwalk Hospital's, Spiegel's, and Puklin's motions to dismiss the two federal law causes of action—claim one and claim two of the

---

[7] Diversity jurisdiction is assessed when the case is filed but, in any event, Francine as executor has the same citizenship as Alice did. 28 U.S.C. § 1332(c)(2).

second amended complaint—for failure to state a claim under Rule 12(b)(6). I DISMISS these claims against the Jane and John Does as well. I DENY defendants Keogh's and Murphy's motions to dismiss as moot, because plaintiffs have voluntarily dismissed those claims. The remainder of the plaintiffs' claims are based on state law, and I decline to exercise supplemental jurisdiction over them.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
             September 20, 2017